UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/14/2020

CHARLESTOWN CAPITAL ADVISORS, LLC,

     Plaintiff,

-against-

ACERO JUNCTION, INC., et al.,

     Defendants.

18-CV-4437 (JGK) (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

     Plaintiff Charlestown Capital Advisors, LLC (Charlestown) a private equity firm, has invoked the attorney-client privilege to withhold from production numerous emails sent to or from its principals John Weber and Lee Smith, as well as various draft business documents prepared by Weber. Some of the withheld communications were limited to Charlestown personnel; some included Charlestown's outside counsel at the law firm Arnold & Porter Kaye Scholar LLP (Arnold & Porter); and some went to or from Kenneth Grossman, a senior managing director at Steppingstone Group LLC (Steppingstone), a non-party financial advisory firm that had a business relationship with Charlestown.

     In its most recent Revised Privilege Log, dated January 28, 2020 (Dkt. No. 135-15), plaintiff identifies Weber, Smith, and Grossman as "attorneys." They are in fact law school graduates, and each of them was, at some point, admitted to practice in New York. However, by the time they prepared, sent or received the challenged documents and emails, each of them was employed in a business capacity, and none of them was authorized, under New York law, to provide legal services to Charlestown. Weber certified in 2015 – prior to any of the events now at issue – that he was "retired" from the practice of law within the meaning of 22 N.Y.C.C.R. § 118.1(g). Smith's law license was suspended in 1999, because he failed to file his biennial registration form or pay the required fee. Grossman "retired from the practice of law some years

ago," Weber Decl. (Dkt. No. 139-1) ¶ 34, and is now listed as "delinquent" in his attorney registration because he too failed to file the required form or pay the required fee. *Id*.

For these reasons and others, as explained in more detail below, I conclude that no attorney-client relationship existed between Charlestown and any of the three law school graduates whose drafts and communications are now at issue. I also conclude – after reviewing a sample of the withheld documents, submitted to me *in camera* – that the communications among Weber, Smith, and Grossman were not primarily or predominantly legal in character, as required to sustain a claim of privilege under New York law. Consequently, Charlestown may not rely on the attorney-client privilege to withhold otherwise-discoverable drafts by Weber, or emails to or from Weber or Smith, unless there is an independent basis for the claim of privilege. Nor may Charlestown withhold its communications with Grossman on privilege grounds. To the contrary: since Grossman was never a Charlestown employee or agent, and plaintiff does not contend that any common interest privilege applies, plaintiff has waived any claim of privilege with respect to materials that it disclosed to Grossman.

## I.    BACKGROUND

Charlestown, headquartered in New York City, is a "well-respected private equity firm with a particular focus on mergers and acquisitions." Compl. (Dkt. No. 1) ¶¶ 27, 43. It has four professional employees, including its founder and managing director Raj Maheshwari and three principals: Weber, Smith, and Robert Bose. *See* Charlestown Capital Advisors, "Our Team," https://www.charlestowncapital.com/who-we-are-1 (last visited Feb. 14, 2020).

Charlestown filed this diversity action on May 18, 2018, asserting claims for breach of contract against Acero Junction, Inc. (Junction) and its parent Acero Junction Holdings, Inc. (Holdings) (collectively, Acero), both of which are headquartered in Mingo Junction, Ohio, and for tortious interference with contract against Holdings' former parent JSM International Limited

(JSM), which was formed in the United Arab Emirates and is headquartered in Dubai. *Id.* ¶¶ 28, 29, 36. All of Charlestown's claims arise out of a January 11, 2018 Engagement Letter executed by Maheshwari and Jateen S. Kapoor, the co-president of Junction and Holdings. *See* Compl. (Dkt. No. 1) ¶ 52 & Ex. A. In the Engagement Letter, Charlestown agreed to act as financial advisor to the "Company" (defined as Junction and its "subsidiaries, divisions, and affiliates") and to use its best efforts to affect a "Transaction" or "M&A Transaction" for its benefit. The Company, in turn, agreed to pay Charlestown a fee on the consummation of any Transaction or M&A Transaction "occurring after the execution of this Agreement but before the end of the term of this Agreement." Eng. Ag. ¶¶ 1.1, 3.1, 3.2. The Engagement Letter is governed by New York law. *Id.* ¶¶ 9.7-9.8.

According to Charlestown, the Engagement Letter entitles it to a fee of approximately $2.6 million (plus interest) in connection with a transaction announced on March 30, 2018, in which JSM transferred 100% of the shares of Holdings to non-party JSW Steel Limited (JSW). Compl. ¶¶ 8-15, 69. Charlestown demanded that fee by invoice dated April 11, 2018, *id.* Ex. C, but defendants failed and refused to pay. *Id.* ¶¶ 18-23. This lawsuit followed.

Fact discovery, which closed on December 24, 2019, was at times contentious. Three issues remain for decision: (1) Charlestown's motion for spoliation sanctions, arising out of Acero's failure to preserve Kapoor's email account (Dkt. No. 124); (2) Charlestown's application for attorneys' fees (Dkt. No. 112), to which it is entitled pursuant to Fed. R. Civ. P. 37(a) and my Order dated October 24, 2019 (Dkt. No. 111), which compelled JSM and Acero to produce witnesses and documents; and (3) JSM's challenge to Charlestown's claims of attorney-client privilege in relation to Weber, Smith, and Grossman, which is the subject of this Memorandum and Order.

On January 21, 2020, after a discovery conference at which the parties presented argument concerning the privilege dispute, I directed JSM to identify "five exemplars from plaintiff's

privilege log for *in camera* review" and directed Charlestown to submit those documents directly to chambers for my review. (Dkt. No. 130, ¶ 2.) In addition, I directed both parties to submit letter-briefs, on the public docket, supporting their respective positions regarding Charlestown's privilege designations. After Charlestown submitted the exemplars *in camera*, and both sides filed their authorized letter-briefs, *see* Pl. Letter dated Jan. 28, 2020 (Dkt. No. 133); JSM Letter dated Jan. 28, 2020 (Dkt. No. 134), JSM filed a further, unauthorized letter-brief on February 3, 2020, *see* JSM Letter dated Feb. 3, 2020 (Dkt. No. 135), to which I permitted Charlestown to respond on February 6, 2020. *See* Pl. Letter dated Feb. 6, 2020 (Dkt. No. 139). Both sides rely on excerpts from the deposition testimony of John Weber (Dkt. Nos. 133-2, 134-1, 135-2) and Raj Maheshwari (Dkt. No. 134-2, 135-4) to support their respective positions. In addition, JSM relies on an excerpt from the deposition testimony of Charlestown principal Robert Bose (Dkt. No. 134-3), and plaintiff relies on Weber's declaration, executed on February 6, 2020.[1]

## II.    ANALYSIS

### A.    Legal Standards

"State law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. Thus, "[in] diversity cases such as this, where state law governs the claims, the Court looks to state law for determining privilege." *Kleeberg v. Eber*, 2019 WL 2085412, at *6 (S.D.N.Y. May 13, 2019) (collecting cases). "The elements of the attorney-client privilege under New York law are the existence of an attorney-client relationship, a communication made within the context of that relationship for the purpose of obtaining legal advice, and the intended and actual confidentiality of that communication." *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 264 (S.D.N.Y. 1995) (*Bowne II*) (citing *People v.*

---

[1] For ease of reference, all citations to deposition testimony in this Memorandum and Order are given as "[witness name] Dep. at __," regardless of which party submitted that particular excerpt.

*Osorio,* 75 N.Y.2d 80, 82-84, 550 N.Y.S.2d 612, 614-615 (1989)); *see also* N.Y.C.P.L.R. (CPLR) § 4503(a)(1) (the attorney-client privilege protects "evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment").

The purpose of the attorney-client privilege is to "promot[e] full and frank communications between attorneys and their clients," thereby encouraging "observance of the law" and aiding "in the administration of justice." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348 (1985); *see also People v. Mitchell*, 58 N.Y.2d 368, 373, 448 N.E.2d 121, 123 (1983) ("Its purpose is to ensure that one seeking legal advice will be able to confide fully and freely in his attorney, secure in the knowledge that his confidence will not later be revealed to the public to his detriment or his embarrassment."). However, "[b]ecause the privilege shields from disclosure pertinent information and therefore 'constitutes an "obstacle" to the truth-finding process,' it must be narrowly construed." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 624, 36 N.Y.S.3d 838, 842 (2016) (quoting *Matter of Jacqueline F.*, 47 N.Y.2d 215, 219, 417 N.Y.S.2d 884, 886 (1979)). Consequently, the party asserting the privilege bears the burden of establishing each element through competent evidence. *Kleeberg*, 2019 WL 2085412, at *7; *see also Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 2977175, at *4 (S.D.N.Y. May 20, 2016) (quoting *von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 144 (2d Cir. 1987) ("the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship"); *Ambac*, 27 N.Y.3d at 624, 36 N.Y.S.3d 838, 842-43 ("The party asserting the privilege bears the burden of establishing its entitlement to protection by showing that the communication at issue was between an attorney and a client for the purpose of facilitating the rendition of legal advice or services, in the course of a

professional relationship, that the communication is predominantly of a legal character, that the communication was confidential and that the privilege was not waived.") (internal citations omitted).

The first element – the existence of an attorney-client relationship – ordinarily requires, at a minimum, that the attorney be licensed to provide legal services to the client. *See Kleeberg*, 2019 WL 2085412, at *13 ("The attorney-client privilege typically is restricted to licensed attorneys."); *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 117, 119 (S.D.N.Y. 2013) ("the attorney-client privilege generally applies only to communications with attorneys who are licensed to practice law."); *aff'd,* 982 F. Supp. 2d 260 (S.D.N.Y. 2013). An exception to this rule may be made in "limited circumstances" where a client seeks or obtains legal advice from an individual whom she "reasonably, but mistakenly" believes to be a licensed attorney. *Kleeberg*, 2019 WL 2085412, at *13 (holding that defendants reasonably believed that a former Nixon Peabody partner, who served as their attorney while at that law firm, remained a licensed attorney when he left the firm and offered to "continue acting as 'counsel to [one of the defendants] personally'"); *cf. Financial Technologies Int'l v. Smith*, 2000 WL 1855131, at *7 (S.D.N.Y. Dec. 19, 2000) (holding that corporations, unlike individuals, "have to make sure their attorneys are in fact attorneys," and therefore that FTI could not assert the attorney-client privilege as to its communications with its "secretary and legal counsel," who graduated from law school and passed the New York bar exam but never submitted the paperwork required for admission to the bar).[2]

---

[2] *Financial Technologies* was decided under New York law. 2000 WL 1855131, at *2. In *Gucci Am., Inc. v. Guess?, Inc.*, 2011 WL 9375 (S.D.N.Y. Jan. 3, 2011), the court held that, in a case governed instead by federal common law, the test for corporate clients should be the same as the test for individual clients: "whether the client had a reasonable belief that it was communicating with an attorney." *Id*. at *5. *Gucci* went on to hold that the plaintiff corporation had a "reasonable belief" that its "in-house counsel" Jonathon Moss was an attorney when – among other things – Moss was in fact a member of the California bar (albeit on "inactive" status); Gucci paid his bar membership fees; Moss was also admitted to practice before two federal district courts; Moss

An attorney-client relationship arises only when the client "contacts an attorney in his capacity as such," for the "purpose of obtaining legal advice or services." *Priest v. Hennessy*, 51 N.Y.2d 62, 68-69, 431 N.Y.S.2d 511, 514 (1980). Thus, even in the absence of licensing questions, the proponent of the privilege must show that the attorney was consulted "for the purpose of obtaining legal advice or services." *Id.*; *see also Spectrum Sys. Int'l Corp. v. Chem. Bank*, 78 N.Y.2d 371, 379, 575 N.Y.S.2d 809, 815 (1991) ("[A] lawyer's communication is not cloaked with privilege when the lawyer is hired for business or personal advice, or to do the work of a nonlawyer.").

Where a lawyer has been engaged to provide both legal and business advice, "the court must ascertain which hat the attorney was wearing during the allegedly privileged communication." *Kleeberg*, 2019 WL 2085412, at *6 (holding that the former Nixon Peabody partner was acting as a "consultant" rather than an attorney for his clients, and therefore that their communications with him were not privileged). This problem is particularly acute in the corporate context, because "staff attorneys may serve as company officers, with mixed business-legal responsibility," and even if they are not officers "their day-to-day involvement in their employers' affairs may blur the line between legal and nonlegal communications." *Rossi v. Blue Cross & Blue Shield of Greater New York*, 73 N.Y.2d 588, 92-93, 542 N.Y.S.2d 508, 510 (1989). Thus, the need to apply the privilege "cautiously and narrowly is heightened in the case of corporate staff counsel, lest the mere participation of an attorney be used to seal off disclosure." *Id.*

---

served in plaintiff's legal department for approximately seven years, where he was promoted to "director of legal services" and then to "Director of Legal and Real Estate"; and Moss regularly performed legal services for Gucci, including "appearing before courts and administrative agencies, filing trademark applications, handling employment matters, and negotiating leases." *Id*. Moreover, Gucci "produced the declarations of six current and former executives and its outside counsel stating that they all considered Moss to be an attorney." *Id*.

Even where an attorney-client relationship exists, the client may not reflexively withhold every communication with its attorney as privileged. "[N]ot all communications to an attorney are privileged. In order to make a valid claim of privilege, it must be shown that the information sought to be protected from disclosure was a 'confidential communication' made to the attorney for the purpose of obtaining legal advice or services." *Priest v. Hennessy*, 51 N.Y.2d 62, 69, 431 N.Y.S.2d 511, 514 (1980) (internal quotation omitted). "[I]t is the nature of the communication that controls." *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 129-30 (N.D.N.Y. 2007). If the communication is not "primarily or predominantly of a legal character," *Spectrum Sys.*, N.Y.2d at 377-78, 581 N.E.2d at 1060, it cannot be withheld as privileged. *See also*, *e.g.*, *Ambac*, 27 N.Y.3d at 624, 57 N.E.3d at 34-35 (proponent of privilege must establish "that the communication is predominantly of a legal character"); *Saran v. Chelsea GCA Realty P'ship, L.P.*, 174 A.D.3d 759, 760-61, 104 N.Y.S.3d 698, 700 (1st Dep't 2019) (emails with defendants' in-house counsel were not privileged because they "relate to the business of the defendants, rather than legal issues, and nothing stated by in-house counsel in the emails sets him apart as a legal advisor in the discussion.") (internal citation omitted).

"It is also the burden of the proponent of the privilege to prove non-waiver." *John Blair Commc'ns, Inc. v. Reliance Capital Grp., L.P.*, 182 A.D.2d 578, 579, 582 N.Y.S.2d 720, 721 (1st Dep't 1992). The privilege is waived if "the client voluntarily discloses the communications to another party" or if "the communications are made in the known presence of a third party in whom the client could have no 'reasonable expectation of confidentiality.'" *Morales v. Portuondo*, 154 F. Supp. 2d 706, 730 (S.D.N.Y. 2001) (quoting *Osorio,* 75 N.Y.2d at 84, 550 N.Y.S.2d at 615). *See also Bowne II*, 161 F.R.D. at 264 ("The attorney-client privilege is waived if the communication

is made in the presence of or later divulged to third parties unless the third parties are the attorney's employees or agents.").

**B.    John Weber**

    **1.    Facts**

Weber graduated from Columbia Law School in in 2003, with a J.D., and was admitted to the New York bar in 2005. Weber Decl. ¶¶ 2-3. However, he never practiced law. *See* Weber Dep. 13:5-9 ("I have never worked for a law firm, I have never worked for a legal department of any enterprise other than as a summer associate after my first year of law school."). Instead, after earning his M.B.A. and holding a series of non-legal positions elsewhere, he was hired at Charlestown in 2011 "in a financial role." Weber Decl. ¶ 5.[3]

Maheshwari – who is Charlestown's sole owner – knew that Weber had a J.D. but volunteered, at deposition, that he was uncertain as to whether Weber was "a lawyer." *See* Maheshwari Dep. at 34:22-24 ("John is a lawyer by background. Actually, he has a J.D. I don't know if he's a lawyer or not."). In conducting Charlestown's business, Maheshwari relies on Weber "for everything whether he's an MBA, a JD, his judgment." *Id*. at 35:8-9. Maheshwari agreed, at deposition, that Weber's judgment was based, in part, "upon his experience in learning as a JD," *id*. at 35:10-14, but never testified that he consulted Weber in his capacity as a lawyer (if indeed he had that capacity), and never stated that he sought legal advice or legal services from Weber.

---

[3] According to Charlestown's website, Weber also earned an M.B.A. from Columbia, after which he worked as an analyst from 2003 to 2008 at the investment firm Granite Capital International Group, and worked from 2009 to 2010 at Springdale Advisors, "a firm managing long-short equity investment funds and providing equity research to institutional investors." Charlestown Capital Advisors, "Our Team," https://www.charlestowncapital.com/who-we-are-1 (last visited Feb. 14, 2020). At Charlestown, Weber "provides financial advisory and merchant banking services (including M&A advisory) to public and private market emerging companies." *Id*.

Similarly, when Weber was asked at deposition (on October 17, 2019, before the current privilege dispute arose) whether he "ever practiced law," he testified that, in his job at Charlestown, "I am very rarely asked legal questions by my coworkers and I will try to answer them, so that would be the extent of it, but that is very rare." Weber Dep. at 13:12-16. In his newly-executed declaration, Weber describes a seemingly broader legal role, attesting that he "will occasionally provide legal advice or legal services to Charlestown, such as drafting and reviewing contracts or other legal documents." Weber Decl. ¶ 7. It is clear from his deposition testimony, however, that non-lawyers at Charlestown, including managing director Maheshwari and principal Bose, also drafted and reviewed contracts. *See, e.g.*, Weber Dep. at 55:12-17 (testifying that Charlestown had "other agreements that we have used in the past," which "we certainly modify . . . for new situations as they arise," and that while those modifications could be made by Weber himself, "[i]t could be Rob Bose. It could be Raj [Maheshwari].")". When asked whether he provided modifications "to assist the other principals even on deals where you are not directly involved," Weber answered, "I do that for them and they do that for me." *Id*. at 55:25-56:6.

Both Weber and Maheshwari were involved in negotiating and drafting the Engagement Letter with Acero. Maheshwari Dep. at 36:10-40:23. According to Maheshwari, "The agreement was drafted physically by John Weber, based on my discussions [and] John Weber's discussions with Mr. Jateen Kapoor." *Id*. at 36:10-37:8. Asked about the mechanics of the drafting and revising process, Maheshwari testified, "I believe I might have told John, almost like an old-fashioned dictation of some of the business terms of this." *Id*. at 39:21-24. Maheshwari could not recall whether he personally put pen to paper, but testified, "[I]t would be consistent with my style to take a pen and paper to go through the salient business points." *Id*. at 40:13-15.

Regarding the instant lawsuit, Maheshwari is "the final decision maker," Maheshwari Dep. at 63:13-21, but is "assisted or facilitated" in managing the litigation by Weber and Bose. *Id*. at 64:7-10. Asked whether he relied on Weber for legal advice concerning the case, Maheshwari responded:

> A.    This lawsuit was filed on our behalf by Arnold and Porter I think – yes, I believe Arnold and Porter has been involved from day one and Arnold and Porter is the one that has advised me on this suit.
>
> Q.    As Charlestown's lawyers?
>
> A.    Yes.
>
> Q.    And not John Weber, correct, as a lawyer?
>
> A.    Not as a lawyer, by and large.

*Id*. at 66:8-21. Maheshwari added that Weber came to meetings with Charlestown's lawyers, attended a mediation, and "[w]e talk about it." *Id*. at 676:4-10. Both Weber and Maheshwari reviewed the complaint in this action before it was filed. Weber Dep. at 166:4-17; Maheshwari Dep. at 34:6-9.

Although Weber is one of three Charlestown employees with the title "principal," he has no ownership interest in the firm. *See* Weber Dep. at 115:22-24; Maheshwari Dep. at 63:13-18. He is "paid as a consultant," Weber Dep. at 9:9, by means of a monthly base fee and an annual bonus, which depends "on the type of year Charlestown has." Maheshwari Dep. at 24:13-25:4. When he self-certified as retired from the practice of law in 2015 – which exempted him from paying biennial registration fees – Weber did not discuss his change in status with Maheshwari, because it "did not affect my job or my compensation at Charlestown." Weber Decl. ¶ 11.

## 2.    Weber Was Not Charlestown's Attorney

Under New York law, an attorney otherwise in good standing may certify that he or she is "retired" if, "other than the performance of legal services without compensation, he or she does

not practice law in any respect and does not intend ever to engage in acts that constitute the practice of law." 22 N.Y.C.C.R. § 118.1(g). The exception for "performance of legal services without compensation" is designed to permit retired attorneys to provide pro bono services. *See*, *e.g.*, *Matter of Sullivan*, 140 A.D.3d 1391, 1391-92, 32 N.Y.S. 3d 748, 749 (3d Dep't 2016) (attorney's "retired" status "does not preclude him from providing legal services pro bono"); *Treischmann v. Rotblut*, 1995 WL 168817, at *1 n.2 ("retired" attorneys are "permitted under [§ 118.1(g)] to practice pro bono"); 6A N.Y. Jur. 2d, Attorneys at Law § 7 (Nov. 2019 update) (a "retired" attorney "is not preclude[d] from providing legal services pro bono"). It was not designed to permit salaried employees to serve as in-house counsel for their employers, whether full- or part-time. *See Matter of Giovati*, 171 A.D.3d 214, 218, 98 N.Y.S.3d 71, 73-74 (1st Dep't 2019) (attorney improperly self-certified as "retired" where she maintained "employment as Arbitration Counsel with the NYSE"); *Matter of Joyce*, 72 A.D.3d 202, 206, 893 N.Y.S.2d 600, 603-04 (2d Dep't 2010) (attorney "improperly certified" that he was retired while "employed as the general counsel of an investment bank").[4] I therefore conclude that, once he self-certified as retired, Weber was not authorized by New York law to provide legal services to Charlestown.

---

[4] Weber attempts to reconcile his "retired" status with his claim that he provided legal services to his employer by attesting that he has "never been compensated by Charlestown for providing legal services" and that after his "retirement" he continued to provide such services "without compensation." Weber Decl. ¶¶ 8, 12. However, he provides no supporting detail. He does not claim, for example, that his pay was reduced when he retired from the bar or docked when he performed specific legal services, nor that he was required to perform such services on his own time, outside of the normal business day. Therefore, his statement that he provided legal services "without compensation" can only mean that he was not paid anything *extra* – beyond his monthly consulting fee and year-end bonus – for whatever portion of his time he spent on tasks that he now characterizes as legal. But this cannot be not the test under § 118.1(g). If it were, every employee or consultant who wears "two hats," *Kleeberg*, 2019 WL 2085412, at *6, one of them legal, would be entitled to self-certify as "retired" so long as he did not send a separate bill, or receive extra pay beyond his ordinary compensation, for the time he spent providing legal (as opposed to business) advice or other services.

I further conclude that, even if Weber were licensed to provide compensated legal services, Charlestown has failed to show that it had an attorney-client relationship with him. "No attorney-client privilege arises unless an attorney-client relationship has been established." *Sieger v. Zak*, 60 A.D.3d 661, 662, 874 N.Y.S.2d 535 (2d Dep't 2009). Weber was hired "to do the work of a nonlawyer," *Spectrum Sys.*, 78 N.Y.2d at 379, 581 N.E.2d at 1061, after spending the previous eight years (since his law school graduation) doing similar non-legal work. Charlestown's owner and sole decisionmaker, Maheshwari, did not know whether Weber was an attorney (as opposed to a non-practicing law school graduate), did not rely on him "as a lawyer," Maheshwari Dep. at 66:8-21, and did not ask him to perform any tasks that were not also routinely performed, at Charlestown, by non-lawyer personnel. Nor is there any other evidence – beyond Weber's own attestation that he provided his employer with "legal advice and legal services," Weber Decl. ¶ 7 – that Weber ever wore a legal "hat" at Charlestown, much less that he was consulted by others at Charlestown on any specific occasion "for the purpose of obtaining legal advice or services." *Priest*, 51 N.Y.2d at 68-69, 431 N.Y.S.2d at 514.

Weber's declaration is not enough. Charlestown's burden "can be met only by an evidentiary showing based on competent evidence . . . and cannot be 'discharged by mere conclusory or ipse dixit assertions.'" *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y. 1993) (*Bowne I*) (quoting *von Bulow*, 811 F.2d at 146, and collecting cases). Moreover, since the privilege belongs to – and exits for the benefit of – the client, not the attorney, the existence of the required attorney-client relationship generally must be proved by something more than the attorney's claim that such a relationship existed. *See Priest*, 51 N.Y.2d at 70, 431 N.Y.S.2d at 515 ("[I]ndependent facts beyond the attorney's statements must be shown in order to demonstrate the existence of an underlying attorney-client relationship upon which a claim of

privilege could be based."); *Saran*, 174 A.D.3d at 760-61, 104 N.Y.S.3d at 700 (corporate defendants failed to meet their burden, even though communications were with "in house counsel," where "the affidavits of the defendants' CEO and in-house counsel . . . merely state in a conclusory manner that the communications were confidential and privileged" and identified "no particular communication in which in-house counsel gave legal advice, or in which the defendants' other employees sought legal advice from in-house counsel").[5]

Finally, having reviewed the exemplar emails submitted *in camera* (discussed in more detail below), I conclude that nothing said in those emails by or to Weber "sets him apart as a legal advisor in the discussion." *Saran*, 174 A.D.3d at 761, 104 N.Y.S.3d at 700. Thus, even if Charlestown had persuaded me that it formed an attorney-client relationship with Weber, it could not withhold its internal emails to or from Weber on that basis, because they are not "primarily or predominantly of a legal character." *Spectrum Sys.*, 78 N.Y.2d at 378, 581 N.E.2d at 1060.

### C.    Lee Smith

#### 1.    Facts

According to plaintiff's litigation counsel, Smith graduated from the University at Buffalo Law School, was admitted to practice in New York in 1981, and at one time "worked as an attorney in private practice." Pl. Letter dated Feb. 3, 2020, at 2-3. However, he has been employed for at

---

[5] Because there is no evidence that Charlestown believed that Weber was acting as its attorney, I do not reach the question whether plaintiff would be entitled to invoke the attorney-client privilege as to its communication with Weber on the alternative ground, accepted in *Gucci*, that its belief, albeit mistaken and uninvestigated, was "reasonable." 2011 WL 9375, at *5-6. As recently explained in *Madelaine Chocolate Novelties, Inc. v. Great N. Ins. Co.*, 2020 WL 606447, at *1 (E.D.N.Y. Feb. 7, 2020), *Gucci* "was decided under federal law, and its holding is therefore not in direct conflict with the one reached in *Financial Technologies*." Given the limited state law precedent on the issue, it remains "in doubt whether, under New York law, a corporation may successfully invoke privilege regarding its communications with someone it reasonably believes to be an attorney, or only as to communications with someone whose status as an attorney it has diligently investigated." *Id*. at *2.

least 25 years in a variety of business roles, including serving as President and CEO of Hartland Asset Management, "a registered investment advisor," co-founding American Solar Partners, LLC, "a solar power project design and development company," and working with Charlestown, as a principal, on "a variety of merchant banking and turnaround situations." Charlestown Capital Advisors, "Our Team," https://www.charlestowncapital.com/who-we-are-1 (last visited Feb. 14, 2020). "Prior to his private sector career, Mr. Smith worked in the public sector, as Deputy Commissioner of Economic Development for the State of New York during the administration of Governor Mario Cuomo." *Id.* This also appears to have been a non-legal job. *Id.* When Smith was in private practice, he specialized in "ERISA-related matters." *Id.*

There is no evidence in the record before me that Maheshwari or Bose believed that Smith was authorized to practice law, consulted Smith in his capacity as a lawyer (if indeed he had that capacity), sought legal advice or other legal services from Smith, or otherwise thought of Smith as Charlestown's attorney. Smith himself did not claim to be a lawyer. When asked at deposition whether certain proposed deals would "fall within the definition of an M&A transaction according to the January 11, 2018 [engagement] letter" with Acero, he replied, "Again, I'm not a lawyer, so I can't – I should not be opining on this . . ." Smith Dep. at 340:2-13.

However, Smith's fellow principal Weber – himself a "retired" attorney – now attests that he "reasonably believed" that Smith was "an attorney authorized to practice law in New York" when he "sought legal advice from [Smith] between 2016 and 2018 regarding the engagement agreement that Charlestown signed with [Acero]." Weber Decl. ¶ 15. Weber goes on to list the bases for his belief:

> I knew that Lee Smith had a J.D. and believed he was admitted to the New York bar. I also believed that Lee Smith previously worked as an attorney in private practice after graduating from law school. I was generally aware that Lee Smith sometimes performed work of a legal nature for Charlestown, including reviewing

15

and drafting corporate formation documents. Lee Smith and I have occasionally consulted each other for legal advice.

*Id*. ¶¶ 16-20 (paragraph breaks omitted). Weber does not state what sort of legal advice he sought from Smith regarding the Acero Engagement Letter, nor why he sought it from a colleague who last practiced law, in the employee benefits field, in the early 1990's.

Weber implicitly concedes that he made no effort to verify his beliefs concerning Smith's status until Arnold & Porter asked him to do so last month, at which point he "learned that Lee was not authorized to practice law in New York." Weber Decl. ¶ 21. Weber learned this fact by asking Smith, who reported that his license was suspended more than 20 years ago. *Id*. ¶¶ 22-23.

### 2.     Smith Was Not Charlestown's Attorney

Like Weber, Smith was not authorized to provide legal services to Charlestown. Indeed, because his license was suspended – and had been since 1999 – Smith was not authorized to provide *any* legal services to *any* clients, even on a pro bono basis. *See* N.Y. Jud. Law § 486; *In re Blau*, 70 A.D.3d 28, 31, 888 N.Y.S.2d 8, 11 (1st Dep't 2009) ("an attorney who engages in the practice of law while suspended is guilty of a misdemeanor"). There is no suggestion in the record that Smith himself was unaware of his suspension (which he promptly disclosed to Weber when asked) or that he failed to appreciate its significance. *See Matter of Vayer*, 160 A.D.3d 232, 235, 70 N.Y.S.3d 512, 514 (1st Dep't 2018) ("The [Attorney Grievance Committee] correctly argues that after 17 years of failing to re-register or complete the required CLE credits it is incredible that respondent thought his license to practice law would remain valid."). I therefore conclude that Smith knew he could not serve as Charlestown's attorney in any capacity.

I further conclude that Charlestown has not demonstrated that any of its personnel "reasonably" believed that Smith was a licensed attorney. The only Charlestown employee who claims to have held such a belief is Weber, who struggles in his declaration to identify any *facts*

undergirding that belief other than Smith's J.D. degree, earned in 1981. *See* Weber Decl. ¶ 16 (Weber "believed" that Smith "was admitted to the New York bar"); *id*. ¶ 17 (Weber "believed" that Smith "previously worked as an attorney in private practice"). Weber was himself a recently-retired lawyer, and therefore presumptively aware that holding a law degree and having worked in private practice decades earlier are not reliable indicia of an individual's current licensing status.

This case is a far cry from *Gucci*. Smith's background is similar to that of Scott Wright, the chief administrative office of the plaintiff corporation in *Madelaine Chocolate*.[6] In that case, Judge Gold made short work of plaintiff's privilege claim and directed it to promptly identify and disclose "any communications it has withheld on the basis of attorney-client privilege solely because of Wright's participation in those communications." 2020 WL 606447, at *2. Therefore, even if I assume that a New York court would permit a corporation to assert the attorney-client privilege based on its "reasonable" but uninvestigated belief as to an employee's licensing status, Charlestown would not be entitled to withhold communications with Smith on that basis.

In any event, Charlestown has once again failed to carry its burden of showing that it contacted Smith, in his capacity as a (putative) attorney, "for the purpose of obtaining legal advice or services." *Priest*, 51 N.Y.2d at 68-69, 431 N.Y.S.2d at 514. Weber may well have consulted Smith regarding the Acero Engagement Letter. Nothing in his conclusory declaration, however,

---

[6] Wright – like Smith – graduated from law school in 1981. *Madeleine Chocolate*, 2020 WL 606447, at *1. He then "worked as a law firm associate or in-house counsel until 1989," after which he "held positions as a financial analyst and vice president for investor relations and did not practice law from 1990 until he was hired by Madelaine twelve years later, in 2002." *Id*. In addition, Wright – like Smith – "allowed his membership in the New York State bar to expire in 1999," before he joined Madelaine Chocolate in a business capacity. *Id*. Notwithstanding his lapsed license, Wright at one point referred to himself as plaintiff's "general counsel," though he stopped doing so "well before the events at issue." *Id*. at *2. On these facts, the court had no trouble concluding that plaintiff "failed to meet its burden to establish that it reasonably believed Wright was a practicing member of a bar at the time of the communications at issue." *Id*.

establishes that what he sought from Smith was "legal advice," Weber Decl. ¶ 15, as opposed to business advice, which Smith appeared to have been much better suited to provide.

### D. Ken Grossman

#### 1. Facts

Grossman worked for Steppingstone, a "financial advisory firm," as a senior managing director. Weber Decl. ¶ 25. No further information about Steppingstone is provided.[7] On October 20, 2016, Maheshwari confirmed in an email to Grossman that Charlestown would "pay you 1/3rd of all proceeds net to Charlestown" for "your efforts in consummating any transaction with Acero Junction." (Dkt. No. 135-11.) It is not clear whether the payment would go directly to Grossman or through Steppingstone. Approximately one year later, on October 20, 2017, Charlestown and Steppingstone executed a "Non-Disclosure and Non-Circumvention Agreement" (NDA) (Dkt. No. 135-12) in which Steppingstone agreed to keep confidential the information it received from Charlestown and promised not to negotiate with any of the parties involved in a potential transaction code-named "Project Gold" except through Charlestown. NDA ¶¶ 2, 3.

Grossman obtained a law degree from George Washington University and was admitted to the New York bar in 1982. Weber Decl. ¶ 27. Weber attests that he "reasonably believed" that Grossman was "an attorney authorized to practice law in New York when I sought legal advice from him regarding the engagement agreement that Charlestown signed with Acero." *Id*. ¶ 26.

---

[7] However, it takes only a few minutes on the internet to learn that Grossman is an experienced "distressed investor" who (according to the faculty profile published in connection with his appearance at the 2019 Distressed Investment Conference in New York) specializes in "companies undergoing and or emerging from restructuring and reorganization. He has a substantial track record of managing successful investments and actively participating in the financial, operational and managerial turnaround of target companies." Distressed Investment Conference, "2019 Conference Faculty," https://www.distressedinvestingconference.com/faculty.html (last visited Feb. 14, 2020).

Weber does not state when he sought that advice, what sort of advice he sought, or why he sought it from Grossman. Weber's belief as to Grossman's professional status was based upon his knowledge of Grossman's law degree; his "belief" that Grossman was admitted to the New York bar; his having witnessed Grossman "identify himself as an attorney to other people"; his "understanding" that Grossman "consulted with other lawyers"; his awareness that Grossman "attended bankruptcy proceedings in federal court," at which he "sometimes spoke"; and his recollection that, "in providing legal advice to me, Kenneth Grossman would note that our conversations were confidential." *Id*. ¶¶ 27-31.

Weber made no effort to verify his beliefs concerning Grossman's status until Arnold & Porter asked him to do so last month, at which point he spoke to Grossman and learned that he "retired from the practice of law some years ago," and that he is currently listed as "delinquent" because he "failed to file his biennial registration form." Weber Decl. ¶¶ 33-34.[8]

### 2. Grossman Was Not Charlestown's Attorney

Like Weber and Smith, Grossman was not licensed to provide legal services to Charlestown. Nor, on the record before me, could Weber have reasonably believed that Grossman was a practicing attorney. As noted above, holding a law degree and having once been admitted to the bar are not reliable indicia of current licensing status, as Weber well knew. Moreover, many people who are not themselves attorneys consult with lawyers, conduct confidential business conversations (especially when they have executed NDAs) and attend bankruptcy proceedings. Significantly, Weber states that Grossman "sometimes spoke" at those proceedings, but carefully

---

[8] Lawyers who have self-certified as "retired" are not required to pay registration fees but must still re-register every two years. 22 N.Y.C.C.R. § 118.1(a)-(c), (g).

refrains from attesting that Grossman appeared as counsel to debtors, creditors, or other parties, or engaged in other conduct that would require a current law license.

Regardless of Grossman's licensing status, Weber could not reasonably have believed that Grossman was *Charlestown's* attorney, particularly in connection with any potential Acero transaction, as to which Grossman's firm was Charlestown's business partner. *See In re Out-of-State subpoenas issued by New York Counsel for State of California Franchise Tax Bd.*, 33 Misc. 3d 500, 516-17, 929 N.Y.S.2d 361, 375 (Sup. Ct. Westchester Co. 2011) (patent-holder who licensed his patents to U.S. Philips Corporation had a "business relationship" with Philips and therefore could not assert privilege as to his communications with Philips's counsel concerning "the licensing program or the revenues generated from the licensing"), *aff'd sub nom. Hyatt v. State Franchise Tax Bd.*, 105 A.D.3d 186, 962 N.Y.S.2d 282 (2d Dep't 2013).

"Under New York law, 'the relationship of an attorney and client is contractual, and the rules governing contractual formation determine whether such a relationship has been created.'" *Kleeberg*, 2019 WL 2085412, at *13 (quoting *Kubin v. Miller*, 801 F. Supp. 1101, 1115 (S.D.N.Y. 1992)). There was a contractual relationship between Grossman and Charlestown concerning Acero – evidenced by Maheshwari's email and the later NDA – but nothing in either of those documents, or in any of the other evidence presented to this Court, suggests that the relationship was one of attorney to client. Nor is there any evidence – beyond Weber's conclusory declaration – that Grossman actually provided any "legal advice" to Charlestown. Although the exemplars submitted to me *in camera* include an email chain between Weber and Grossman about Acero, nothing in those emails (discussed in more detail below) reflects any recognizable request for or communication of legal advice.

"A client's subjective belief that an individual is their attorney, without more, is insufficient to show that an attorney-client relationship exists." *Kleeberg*, 2019 WL 2085412, at *13 (internal quotations omitted); *accord NXIVM Corp.*, 241 F.R.D. at 129 ("If that were true that we rely solely upon subjective beliefs of the client, then why would the courts labor so strenuously and consistently to create objective elements to help others determine whether an attorney-client relationship truly exists[?]"); *Kubin*, 801 F. Supp. at 1115 (S.D.N.Y. 1992) (subjective belief of putative client "is not sufficient to establish an attorney-client relationship"). In this case, the Court has been presented with little more than Weber's subjective belief that Grossman was Charlestown's attorney, unsupported by anyone else at Charlestown, by Grossman himself, or by the objective contents of their communications. Consequently, Charlestown may not withhold its communications with Grossman as privileged on the ground that he was its attorney.

Moreover, since Grossman was not an employee or agent of Charlestown (or Arnold & Porter), and since Charlestown has never asserted any common interest privilege, any disclosure of privileged communications to Grossman operated as a waiver of Charlestown's privilege. *See Kleeberg*, 2019 WL 2085412, at *7 ("Attorney-client privilege generally is waived if the holder of the privilege discloses or consents to disclosure of privileged communications to a third party."); *accord Morales*, 154 F. Supp. 2d at 730; *Osorio*, 75 N.Y.2d at 84, 550 N.Y.S.2d at 615.

E.      **The Exemplars**

Document HIMA_00332554-55 is a February 16, 2017 email from Weber to Maheshwari attaching a draft Acero engagement letter bearing the same date. Plaintiff's Revised Privilege Log states that the email "contain[s] legal advice regarding draft of engagement letter," but in fact it is merely a transmittal email with no text at all. Nor are there any notes or other comments (whether legal or nonlegal in nature) on the draft. As noted above, preparing an engagement letter between a financial services firm and a client is not an inherently legal task. Preparing and reviewing such

documents was part of the regular business of Charlestown, and was performed by non-lawyer staff as well as those with law degrees. Weber Dep. at 55:12-56:6. Thus, the fact that Weber (as opposed to, say, Maheshwari or Bose) physically "created" the February 16, 2017 Acero draft does not render the document privileged. *See Bertalo's Rest. Inc. v. Exch. Ins. Co.*, 240 A.D.2d 452, 454-55, 658 N.Y.S.2d 656, 658-59 (2d Dep't 1997) (quoting *Landmark Ins. Co. v. Beau Rivage Rest., Inc.*, 121 A.D.2d 98, 101, 509 N.Y.S.2d 819, 822 (2d Dep't 1986)) (since "payment or rejection of claims is a part of the regular business of an insurance company," the defendant carrier could not assert privilege over "reports made by the attorneys who conducted the investigation of the claim on [its] behalf . . . [or] communications from the carrier to those attorneys"). Moreover, as discussed above, Weber was not an attorney authorized to provide legal services to Charlestown, and did not have an attorney-client relationship with his employer. The email and its attachment must be produced.

Document HIMA_00795702 is another draft of the Acero engagement letter, dated September 20, 2017, "obtained from John Weber's computer." Pl. letter dated Jan. 28, 2020, at 2. Charlestown does not claim that this draft was communicated to anyone, nor that it reflects any communication between an attorney and a client. Rather, plaintiff asserts that the document is privileged because "it is a legal document authored by Mr. Weber, an attorney for Charlestown." *Id*. Plaintiff may be confusing the attorney-client privilege (which requires, at a minimum, a confidential "communication" between attorney and client, *see* CPLR § 4503(a)(1)), with the work product doctrine (which may protect an attorney's uncommunicated work product, but only where, among other things, the document was "prepared in anticipation of litigation or for trial," *see* Fed. R. Civ. P. 26(b)(3)(A)). Here, neither applies. The document must be produced.

Document HIMA_00795935 is an unsigned draft demand letter, dated April 30, 2018, addressed to counsel for defendants. It was authored by Arnold & Porter partner Sam Lonergan, who served as Charlestown's litigation counsel in this action, and was prepared on Arnold & Porter letterhead. The document contains a few handwritten edits and was, according to plaintiff, found on Weber's computer. Pl. letter dated Jan. 28, 2020, at 2. Plaintiff is correct that this document qualifies for work product protection pursuant to Rule 26(b)(3)(A) – not because Weber was acting as a lawyer, or performing legal services, but because the draft was prepared in anticipation of litigation by Charlestown's outside counsel, and there is no evidence that it was disclosed to anyone other than Charlestown personnel. *See, e.g.*, *Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 104 (S.D.N.Y. 2002) ("draft pleadings, draft briefs, and other drafts or documents prepared by lawyers" in "anticipation of litigation" are "work product documents"). To the extent the edits were Weber's, and were (or were intended to be) communicated to Arnold & Porter in confidence, they are protected by the attorney-client privilege.

Document HIMA_00986934 is an email chain between Weber and Grossman (portions of which were copied to Maheshwari and Bose), all dated April 17, 2018, in which Weber provides Grossman with information about the then-pending sale of Junction's stock from JSM to JSW. Weber informed Grossman, among other things, that the transaction was a stock sale, that the final closing was expected around May 31, and that the buyer, JSW, "has an absolute right to walk away during the due diligence process." He also identified (without comment) the law firm that represented defendants in the transaction. According to the Revised Privilege Log, Weber was "providing information for purposes of obtaining legal advice regarding instant action." However, there is nothing about the exchange that would mark it as a conversation among lawyers rather than one among investment professionals with a shared financial interest in the closing of a

transaction. Nor is there any discussion, directly or indirectly, about "a potential lawsuit." Pl. letter dated Jan. 28, 2020, at 2-3. Thus, even if I were persuaded that there was an attorney-client relationship between Charlestown and Grossman, I would conclude, once again, that the withheld emails are not privileged because they are not "primarily or predominantly of a legal character." *Spectrum Sys.*, 78 N.Y.2d at 378, 581 N.E.2d at 1060. The emails must be produced.

Document HIMA_00987864-65 is a May 16, 2018 email from Weber to Smith, with a copy to Maheshwari, asking for their thoughts on the enclosed draft complaint against defendants. Plaintiff represents, and the Court has no reason to doubt, that the draft was prepared by Arnold & Porter. Pl. letter dated Jan. 28, 2020, at 3. While the email itself is not privileged (because it merely circulates the draft, without otherwise conveying counsel's opinions or advice), plaintiff is correct that the draft is protected from discovery as work product. *See Astra Aktiebolag*, 208 F.R.D. at 104. Moreover, Weber did not waive the protection of the work product doctrine by circulating the draft within Charlestown. *See Bowne I*, 150 F.R.D. at 479 (a waiver of work product protection will generally be found "only if the party has voluntarily disclosed the work-product in such a manner that it is likely to be revealed to his adversary").

## III.    CONCLUSION

For the reasons stated above, plaintiff must promptly produce Documents HIMA_00332554-55, HIMA_00795702, and HIMA_00986934, together with any other documents previously withheld on the ground that John Weber, Lee Smith, or Kenneth Grossman was acting an attorney for Charlestown. In addition, plaintiff must produce any otherwise-privileged documents or communications that were disclosed to Grossman, as well as those produced to other non-employees unaffiliated with its counsel.[9]

---

[9] For example, JSM notes that plaintiff relied on the attorney-client privilege to withhold a November 2, 2016 email (identified as Document HIMA_00958411) sent by Weber to various

In accordance with Fed. R. Civ. P. 37(a)(5)(A), JSW is entitled to an award of its attorneys' fees and related expenses reasonably incurred after January 21, 2020 to obtain the relief granted herein. JSW shall submit its fee application no later than **February 28, 2020**, supported by contemporaneous time records showing, for each attorney or other timekeeper, the date of service, the hours expended, and the nature of the work performed, and by properly authenticated documentation of all reimbursable expenses. Charlestown may submit responding papers no later than **March 6, 2020**, limited to the amount of the fees and other expenses to be awarded and the allocation of the award among plaintiff and its counsel. There shall be no reply.

Dated: New York, New York
        February 14, 2020

**SO ORDERED**.

_____

**BARBARA MOSES**
**United States Magistrate Judge**

---

attorneys at the law firm Dentons US LLP – which at one point represented Charlestown in connection with the Acero transaction – and to three individuals at Anadi Bank. JSM Letter dated Jan. 28, 2020, at 2 n.1. The Revised Privilege Log states that the email sought "legal advice regarding potential structuring of a Mingo Junction transaction." However, the Anadi personnel are not identified as attorneys, and in any event, Charlestown makes no common interest privilege claim. It thus appears that Document HIMA_00958411 was improperly withheld.